IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CAROLINE ZUNO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 06 C 223 |
| | ) | |
| CATHOLIC BISHOP OF CHICAGO, | ) | Judge Ronald A. Guzmán |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Caroline Zuno has sued the Catholic Bishop of Chicago ("Archdiocese") for national

origin discrimination and retaliation pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §

2000e *et seq.* Before the Court is defendant's motion for summary judgment. For the reasons

provided in this Memorandum Opinion and Order, the Court grants the motion.

## FACTS[1]

Between 2002 and 2007, over fifty Catholic schools within the Archdiocese closed due to

lack of enrollment. (Def.'s LR 56.1(a)(3) Stmt. ("Def.'s LR 56.1(a)(3)") ¶ 2.) In April 2002, in

an attempt to address the enrollment concerns, the Archdiocese hired Zuno and Mary Lazarikos,[2]

a non-Hispanic female, as marketing consultants. (*Id.* ¶¶ 3-6.) The Archdiocese told Zuno

when she was hired that the marketing consultant position would be evaluated at the end of a

---

[1]Unless otherwise noted, the following facts are either undisputed or deemed admitted due to the opposing party's failure to comply with Local Rule 56.1.

[2]Although Lazarikos used her married name, "Estrada," while employed by the Archdiocese, she currently uses her maiden name, "Lazarikos," and her deposition refers to her by that name and therefore the Court will refer to her as "Lazarikos."

twelve-month period.[3]  (*Id.* ¶ 6.)  Together, Zuno and Lazarikos worked with schools in the Archdiocese to develop local marketing plans, which were then implemented by volunteers at each school.  (*Id.* ¶ 7.)

At some point after Zuno was hired, she, Lazarikos and their boss Mike Krivich were transferred from the Archdiocese's Office of Communications to the Office of Catholic Schools ("OCS").  (Def.'s Ex. D, Zuno Dep. at 20.)  On January 10, 2003, as part of the ongoing restructuring of the Archdiocese's school marketing efforts, the position held by Krivich was eliminated.  (Def.'s LR 56.1(a)(3) ¶ 10.)  Although Lazarikos's responsibilities remained the same, Zuno became responsible for system-wide, rather than local, marketing, which included print and radio campaigns that targeted the entire Archdiocese.  (Def.'s Ex. D, Zuno Dep. at 20; Def.'s Ex. E, Lazarikos Dep. at 21.)  After Krivich's position was eliminated, Zuno and Lazarikos reported to Sr. Dawn Tomaszewski.  (Def.'s Ex. E, Lazarikos Dep. at 22.)

In 2004, Sr. Tomaszewski began evaluating the marketing approach to determine whether it was offering a substantial value to the schools.  (Def.'s LR 56.1(a)(3) ¶ 11.)  In the beginning of 2004, Zuno returned to local marketing.  (Def.'s Ex. D, Zuno Dep. at 24.)  In July 2004, Sr. Tomaszewski's religious order transferred her to work in a high school before her evaluation could be completed.  (Def.'s LR 56.1(a)(3) ¶ 11; Def.'s Ex. G, Foley's Dep. at 33.)

In August 2004, again, as part of the ongoing restructuring of the Archdiocese's school marketing efforts, the Archdiocese hired Colleen Dolan as the Director of Communications and Public Relations.  (Def.'s LR 56.1(a)(3) ¶ 16.)  Sometime in the fall of 2004, Dolan attended a

---

[3]However, after the twelve-month period ended, Zuno and Lazarikos's positions remained part of the Archdiocese's marketing efforts.

meeting at which Jimmy Lago, Chancellor of the Archdiocese, announced that the marketing function would be transferred back to the Office of Communications and coordinated and directed by her. (*Id.* ¶ 18; Dolan Dep. at 46-47.) She was given the task of creating an improved, more effective school marketing and communications operation. (Def.'s LR 56.1(a)(3) ¶ 19.) To complete this task she studied the viability of the marketing model that was in place, spoke with various individuals and reviewed call reports and activity reports. (*Id.* ¶ 20.)

In August 2004, the Archdiocese also hired Susan Burritt as the Director of School Marketing to replace Sr. Tomaszewski. (*Id.* ¶¶ 11, 14; Def.'s Ex. G, Foley Dep. at 33.) Zuno, Lazarikos and their part-time administrative assistant were the only people who reported to Burritt. (Def.'s LR 56.1(a)(3) ¶ 15.)

Burritt is the only person in the Archdiocese that Zuno claims discriminated against her based on her national origin. (*Id.* ¶ 35.) After Zuno attended professional development events that were not strictly marketing events on two occasions, Burritt told Zuno in a menacing tone that she was not to attend any further events. (*Id.* ¶ 36.) Burritt was critical of things such as typographical errors and extra spaces between words in documents prepared by Zuno, and Zuno felt that Burritt was not constructive in her criticism. (*Id.* ¶ 37.) Zuno perceived that Burritt frequently glared at her and gave her dirty looks. (*Id.* ¶ 41.)

In October 2004, Lazarikos voluntarily resigned. (*Id.* ¶ 22.) She had found a higher-paying managerial position elsewhere. (*Id.*; Def.'s Ex. E, Lazarikos Dep. at 9.) Lazarikos was not replaced following her resignation. (Def.'s LR 56.1(a)(3) ¶ 25.) Prior to her departure, Dolan asked Lazarikos to share feedback regarding the school marketing program. (*Id.* ¶ 24.) Lazarikos stated that the marketing would have been more effective if more than two people

3

were doing it. (*Id.* ¶ 24.) From her conversation with Lazarikos, Dolan had the impression that the existing marketing plan was ineffective. (*Id.*)

After Lazarikos resigned, Burritt told Zuno that she should not attend monthly System Vitality Meetings, meetings that Zuno had attended for over two years while working under Sr. Tomaszewski. (*Id.* ¶ 39.) Burritt also told Zuno that she was no longer required to attend monthly OCS meetings because Dolan had directed Burritt to attend them as the designated marketing representative. (*Id.* ¶ 40.)

During December, school marketing was finally transferred back to the Archdiocese's Office of Communications and at that point, Zuno reported to Burritt, who reported to Dolan, who reported to Lago. (*Id.* ¶ 26.) By December 2004, Dolan began leaning toward taking the school marketing efforts in a different direction. (*Id.* ¶ 27.) She concluded that the marketing model, including the marketing positions, was not effective and not the best use of the available resources. (*Id.*) She also concluded that the outside marketing and public relations consulting firm was not providing the value to the schools she thought it should. (*Id.*)

During the week of December 6, 2004, Zuno stopped by Lago's office and complained about Burritt's treatment of her. (Pl.'s LR 56.1(b)(3)(C) Stmt. ("Pl.'s LR 56.1(b)(3)(C)") ¶ 27.)[4] Lago told Zuno he would speak to Dolan about Zuno's concerns. (Def.'s LR 56.1(a)(3) ¶ 59.)

_____

[4]The following facts are disputed, and thus assumed true for purposes of the instant summary judgment motion. Zuno told Lago that she believed there was a pattern that Burritt targeted immigrants, Hispanics, and people of different national origins. (*Id.* ¶ 29.) Zuno mentioned that Agnes Mleczek, an Archdiocese employee who worked for another supervisor, had similar complaints about Burritt's being disrespectful to her. (*Id.* ¶ 28.) Zuno indicated that another employee, whose name she did not mention, had been subject to sharp criticism by Burritt. (*Id.*) Although Zuno also states that she mentioned Dianne Dunagan's name, the content of Dunagan's statement is inadmissible hearsay. (*Id.* ¶ 30.)

4

Lago spoke with Dolan and told her that Zuno had complained of Burritt's treatment of her and Agnes Mleczek, who worked for another supervisor. (Pl.'s LR 56.1(b)(3)(C) ¶ 33; Def.'s Ex. I, Dolan Dep. at 56.) It is disputed and thus assumed true for purposes of the summary judgment motion that Lago told Dolan that Zuno had complained of national origin discrimination. (*Compare* Def.'s LR 56.1(a)(3) ¶ 64, *with* Pl.'s LR 56.1(b)(3)(B) Stmt. ("Pl.'s LR 56.1(b)(3)(B)") ¶ 64.) Lago told Dolan to look into it. (Pl.'s LR 56.1(b)(3)(C) ¶ 33.)

Dolan spoke with Burritt regarding concerns about whether she was getting along with Zuno. (Def.'s Ex. I, Dolan Dep. at 57.) Burritt replied that Zuno did not like providing Burritt with certain reports and accounting for where she was at any given time. (*Id.*)

Dolan visited Mleczek's office and said that Zuno had complained to Lago about Burritt and that Zuno had also mentioned Mleczek's name as someone who was not treated well by Burritt. (*Id.* ¶ 35; Mleczek's Dep. at 30.) Dolan asked Mleczek to let her boss, Jim Dwyer, know if she had a problem with any employee in the Archdiocese. (*Id.* ¶ 35; Mleczek Dep. at 30, 33.) Mleczek did not complain to Dwyer. (Mleczek Dep. at 30.)

Lago received a verbal report from Dolan regarding Zuno. (Pl.'s LR 56.1(b)(3)(C) ¶ 34.) She told him that she had spoken to Mleczek and that there was no indication that Mleczek had a problem with any employee in the Archdiocese of Chicago. (*Id.*; Mleczek Dep. at 30 (stating "at that time I didn't").)

After Zuno met with Lago, she met with Sr. Judith Cauley, Assistant Superintendent for Catholic Schools. (Def.'s LR 56.1(a)(3) ¶ 60.) According to Zuno, she intended to talk about Burritt's abusive behavior toward others, but was cut off by Cauley before she could do so. (Pl.'s LR 56.1(b)(3)(B) ¶ 60.) Cauley suggested that Zuno speak to Burritt and offered to mediate that

5

discussion. (Def.'s LR 56.1(a)(3) ¶ 62.) Zuno never responded to Cauley's offer and Cauley

never followed up with Zuno. (Pl.'s LR 56.1(b)(3)(B) ¶ 62.) In addition, Zuno never spoke to

Burritt or Dolan about any issues relative to Burritt's behavior. (Def.'s LR 56.1(a)(3) ¶¶ 56-57.)

On December 13, 2004, Zuno stopped by Lago's office a second time. (*Id.* ¶ 63.) Zuno

informed Lago that her meeting with Sr. Cauley did not provide a resolution. (*Id.*)

In January 2005, Dolan finished her evaluation of the old marketing program, created a

new "systemic" approach to marketing for the Archdiocese, which included the elimination of

the marketing consultant positions. (*Id.* ¶¶ 28-29.) The new approach was different from the old

approach in that schools requesting marketing assistance would come to the Archdiocesan

Pastoral Center for marketing instruction, rather than having a marketing consultant come to

them. (Pl.'s LR 56.1(b)(3)(B) ¶ 30.) No new hires were required for this new marketing

structure. (Def.'s LR 56.1(a)(3) ¶ 30.) The Marketing Team included Dolan; Burritt; Jim

Dwyer, Director of Media Relations; Tom Sheridan, editor of the Catholic New World magazine;

Alejandro Castillo, Director of Hispanic Communications and editor of Catolico, a Hispanic

publication; Jim Disch, Director of the Office of Radio and Television; and Dianne Dunagan,

project manager. (*Id.* ¶ 31.)

On January 14, 2005, Dolan told Zuno that her position was being eliminated, Fred Van

den Hende explained Zuno's benefits and other matters, and Zuno was escorted by security from

the building. (Pl.'s LR 56.1(b)(3)(C) ¶¶ 45-46.) Employees who are involuntarily terminated are

either given two-weeks prior notice or two-weeks pay in lieu of notice. (*Id.* ¶ 47.) Dolan did not

consider plaintiff's ethnic background when deciding to terminate her. (*Id.* ¶ 43.) Ten days after

Zuno was terminated, Lago approved the elimination of the marketing consultant position. (*Id.* ¶

45; Lago Dep. at 75.)

## Discussion

Summary judgment is to be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court resolves all ambiguities and draws all reasonable inferences in favor of the nonmoving party. *Michas v. Health Cost Controls of Ill. Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). "To overcome a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial." *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). "The nonmoving party must show that there is evidence upon which a jury reasonably could find for h[er]." *Id.*

### I. National Origin Discrimination

Title VII prohibits employers from discharging or discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff has two ways to prove employment discrimination: the direct and indirect methods. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003).

Zuno does not even address her discrimination claim in her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. (*See generally* Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 1-19.) "A party opposing a summary judgment motion must inform

7

the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1237 (7th Cir. 1997); *see Resolution Trust Corp. v. Juergens*, 965 F.2d 149, 153 (7th Cir. 1992); *Maust v. Headley*, 959 F.2d 644, 650 (7th Cir. 1992); *Patrick v. Jasper County*, 901 F.2d 561, 566 (7th Cir. 1990); *Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919, 922 (7th Cir. 1990) ("[A]ny arguments in opposition to summary judgment not properly raised in the district court are waived.").

Zuno's lack of attention to her national origin discrimination claim mirros the lack of necessity for a trial on the merits of this claim. Under either method of proving employment discrimination, a plaintiff must establish that she suffered an adverse employment action. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008) (indirect method); *Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004) (direct method). Though the term is interpreted broadly in this circuit, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). An adverse job action includes only those actions that cause "a materially adverse change in the terms or conditions of her employment." *Spring v. Sheboygan Sch. Dist.*, 865 F.2d 883, 885 (7th Cir. 1989). "A materially adverse change might be indicated by a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *see id.* at 135-36 (holding that lateral transfer to job with same salary, benefits and level of responsibility was not an adverse employment action); *Spring*, 865 F.2d at 886 (holding that reassignment of school principal, which did not negatively impact responsibilities or salary, was

8

not adverse employment action).

It is undisputed that Zuno does not claim that she was terminated on account of her national origin. (Pl.'s LR 56.1(b)(3)(B) ¶ 29; Pl.'s LR 56.1(b)(3)(C) ¶ 43.) Zuno solely bases her national origin discrimination claim on the following incidents: (1) although Zuno had attended professional development events that were not strictly marketing events on two occasions, Burritt told Zuno in a menacing tone that she was not to attend any further events (Def.'s LR 56.1(a)(3) ¶ 36); (2) Burritt also told Zuno that she was no longer required to attend monthly OCS meetings because Dolan had directed Burritt to attend them as the designated marketing representative (*Id.* ¶ 40); (3) after Lazarikos resigned, Burritt told Zuno that she should not attend monthly System Vitality meetings, meetings that Zuno had historically attended (*id.* ¶ 39); (4) after Lazarikos resigned, Burritt discontinued weekly staff meetings and Zuno continued communicating with Burritt via email and face-to-face meetings (Pl.'s LR 56.1(b)(3)(C) ¶¶ 17, 19); (5) Burritt was critical of things such as typographical errors and extra spaces between words in documents prepared by Zuno, and Zuno felt that Burritt was not constructive in her criticism (*id.* ¶ 37); (6) Zuno perceived that Burritt frequently glared at her and gave her dirty looks (*id.* ¶ 41); and (7) after a Christmas 2004 gift exchange, Burritt yanked a vacuum cleaner cord from Zuno's hand and told her to let it go (*id.* ¶ 42).

Zuno has failed to raise a triable issue regarding whether any of these incidents, considered alone or together, constitute an adverse employment action. She has not created a genuine issue of fact as to whether her non-attendance at System Vitality and OCS meetings or professional development events resulted in significantly diminished material responsibilities for her marketing consultant position or prevented her from doing her job. The mere fact that she

had attended them in the past does not create a reasonable inference that they were essential for job performance.[5] Further, when Burritt discontinued the weekly staff meetings after Lazarikos resigned, it is undisputed that Burritt and Zuno continued to communicate via email and face-to-face meetings. (Pl.'s LR 56.1(b)(3)(C) ¶¶ 17, 19.) As for the remaining incidents of which Zuno complains, Burritt's criticism for typographical errors and the like, Burritt's glaring or dirty looks and the vacuum cleaner cord incident clearly do not rise to the level of an adverse employment action.

In sum, the Court holds that Zuno has failed to establish that Burritt caused her to suffer an adverse employment action. Accordingly, the Court grants the Archdiocese's motion for summary judgment as to her national origin discrimination claim.


## II. Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). "An employee bringing a retaliation claim may use either the direct or indirect methods of proof to support her claim." *Gates*, 513 F.3d at 686 (quotation omitted).

Zuno has chosen the direct method of proving her retaliation claim. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 5.) To establish a *prima facie* case of retaliation under the direct

---

[5]Further, the statement of Suzanne Bordenaro, the Archdiocese's part-time consultant for family and school associations, that school vitality meetings related to anything, including school marketing, that would keep a school vital in the community, does not raise a triable issue as to whether Zuno's nonattendance at such meetings amounted to a significantly diminished material responsibility. (*See* Pl.'s LR 56.1(b)(3)(C) ¶ 15; Pl.'s Ex. 12, Bordenaro Dep. at 15.)

method, "a plaintiff must offer evidence that [s]he engaged in a statutorily protected activity, that the defendants subjected h[er] to an adverse employment action and that a causal connection exists between the two events." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). "If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the employer to produce a non-discriminatory reason for its employment action." *Metzger v. Ill. State Police*, 519 F.3d 677, 680 (7th Cir. 2008). "If the employer meets its burden of production, the burden of proof then remains with the plaintiff to show that the employer's proffered reason is pretextual." *Id.*

Zuno has raised a genuine issue of material fact regarding the first two elements. "[A]n informal complaint to a supervisor may constitute protected activity." *See, e.g., Adusumilli v. City of Chi.*, No. 95 C 7680, 1997 WL 769457, at *8 (N.D. Ill. Dec. 9, 1997), *aff'd*, 154 F.3d 353 (7th Cir. 1998); *Damato v. Jack Phelan Chevrolet Geo, Inc.*, 927 F. Supp. 283, 288 (N.D. Ill. 1996). In December 2004, Zuno spoke with Jimmy Lago, the Chancellor of the Archdiocese, who is the supervisor of Burritt's supervisor, and complained of Burritt's treatment of her. (Pl.'s LR 56.1(b)(3)(C) ¶ 27.) It is disputed and assumed true for the purpose of this motion that Zuno also complained that Burritt's conduct constituted national origin discrimination. (*Id.* ¶¶ 28-30, 33.)[6] Further, Zuno's termination on January 14, 2005 satisfies the adverse employment action

---

[6]Zuno also disputes that Lago never told Dolan about Zuno's allegation of national origin discrimination. (*Compare* Def.'s LR 56.1(a)(3) ¶ 64, *with* Pl.'s LR 56.1(b)(3)(B) ¶ 64.) However, as discussed below, even if Dolan knew that Zuno had complained of national origin discrimination it would not create a reasonable inference that Dolan's decision to eliminate the marketing consultant positions was a pretext for retaliation.

requirement for purposes of establishing a *prima facie* case of retaliation.[7] (Pl.'s LR 56.1(b)(3)(C) ¶¶ 45-46.)

Zuno, however, fails to satisfy the third requirement because she has not created a triable issue regarding whether there is a causal link between the protected activity and the adverse action. "In order to demonstrate the 'causal link,' the plaintiff must demonstrate that the employer would not have taken the adverse action 'but for' the protected expression." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 939 (7th Cir. 1996). A case of retaliation can "be made by assembling a number of pieces of evidence none meaningful in itself . . . when taken as a whole, provide strong support if all point in the same direction: 'a number of weak proofs can add up to a strong proof.'" *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (quoting *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004)). "[E]vidence of this sort need not necessarily take the form of a convincingly rich mosaic; it is enough that the circumstances give rise to a reasonable and straightforward inference that the employer has relied on a proscribed factor in taking action against the employee." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1053 (7th Cir. 2006). Zuno opines that a genuine issue of material fact exists because her termination took place shortly after she complained. The Seventh Circuit has repeatedly stated that the "timing of complaints, standing alone, does not create a genuine issue as to a causal connection." *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th

---

[7]Although Zuno implies that the Archdiocese's failure to give her a two-week notice prior to her termination also constitutes an adverse employment action, she has failed to create a triable issue as to whether such is the case. The Archdiocese's policy provides that employees who are involuntarily terminated are either given a two-week prior notice *or* two-weeks of pay in lieu of notice. (*Id.* ¶ 47 (emphasis added).) Zuno does not argue that the Archdiocese failed to provide her two weeks of pay in lieu of a two-week notice, and she does not explain why the provision of one versus the other constitutes an adverse employment action.

Cir. 1992); *see Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (stating that one event's following on the heels of another is not dispositive in proving that first act caused the second); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 642 (7th Cir. 2002) (stating that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue"); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) ("[A plaintiff] needs more than a coincidence of timing to create a reasonable inference of retaliation"); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (stating that plaintiff must be able to point to other reasons that suggest a relationship between the two events).

Thus, the fact that Dolan terminated Zuno on January 14, 2005 shortly after Zuno had complained on December 6, 2004, in and of itself, does not raise a reasonable inference that the two events are causally related. Zuno must therefore point to other reasons that suggest a relationship between her complaint and termination. However, the other reasons Zuno provides merely address the issue of pretext. This jumps the gun because Zuno has yet to satisfy all of the elements of a *prima facie* case of retaliation under the direct method of proof, and thus the burden of production has not shifted to the Archdiocese to proffer a non-retaliatory reason for her termination.

However, even if Zuno were able to establish a *prima facie* case, she has ultimately failed to raise a triable issue regarding whether the Archdiocese's proffered reason for her termination is a pretext for retaliation. Proving pretext requires a plaintiff to show that defendant's reason had no basis in fact, was not the real reason for the adverse employment action or did not justify

13

the adverse employment action. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 652 (7th Cir. 2001). A plaintiff "must present facts to rebut each and every legitimate, non-discriminatory reason advanced by the [employer] in order to survive summary judgment." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1007 (7th Cir. 2001). "The existence of a genuine issue of triable fact with respect to some of the reasons for discharge proffered by the employer is of no consequence as long as at least one reason is uncontested." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 399 (7th Cir. 1998). The Seventh Circuit has repeatedly emphasized that a federal court "does not sit as a super personnel department to review an employer's business decisions." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000); *see Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 878 (7th Cir. 2002); *Ritter v. Hill 'N Dale*, 231 F.3d 1039, 1044 (7th Cir. 2000); *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992). "This Court has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions." *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 899 (7th Cir. 1999).

It is undisputed that by December 2004, Dolan wanted to take the school marketing efforts in a different direction. (Def.'s LR 56.1(a)(3) ¶ 27.) Dolan concluded that the marketing model was ineffective and not the best use of available resources. (*Id.*) In addition, she determined that a public relations and marketing consulting firm hired by the Archdiocese was not providing the value to the schools that she thought it should. (*Id.*) Accordingly, in January 2005, Dolan made the final decision to change the marketing model, which included eliminating the marketing consultant positions. (*Id.* ¶¶ 28-29.)

14

First, Zuno argues that Dolan fabricated the reason for Zuno's termination, *i.e.*, that the old school marketing system was ineffective. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 9.) Zuno relies on the deposition testimony of Sr. Cauley, who stated that the principal of St. Florian's had provided positive feedback about Zuno's helpfulness and value to St. Florian's and recalled some feedback that the marketing system was helpful. (Pl.'s LR 56.1(b)(3)(C) ¶ 51; Def.'s Ex. C, Cauley Dep. at 82-83.) She also points to Lazarikos's testimony. Zuno admits that Lazarikos stated there were too many schools for Zuno and her to cover by themselves and although the Archdiocese had the best of intentions with the marketing efforts, the structure that was set up was not very conducive for one person or two people to get the job done. (Pl.'s LR 56.1(b)(3)(C) ¶ 52; Def.'s Ex. E, Lazarikos Dep. at 29.) Lazarikos also stated she felt that the schools welcomed the marketing effort and heard positive feedback from people in the OCS, including Nick Wolsonovich, Lago, Sr. Cauley, Sr. Tomaszewski, as well as the schools with which she worked. (*Id.*) In addition, Zuno relies on the testimony of Suzanne Bordenaro, a part-time consultant for family and school associations in the Archdiocese, who stated that she felt Zuno and Lazarikos were doing an excellent job and school principals gave her positive feedback regarding how well they were doing. (Pl.'s LR 56.1(b)(3)(C) ¶ 52; Pl.'s Ex. 12, Bordenaro Dep. at 11-12.)

Cauley, Lazarikos and Bordenaro's testimony do not raise a reasonable inference that Dolan did not honestly believe that the old school marketing model was ineffective and not the best use of the Archdiocese's resources. At most, their testimony shows that people other than Dolan had received positive feedback regarding Zuno and/or Lazarikos's efforts in school marketing. Moreover, Zuno concedes that Lazarikos told Dolan upon Lazarikos's resignation

that there were not enough people providing marketing in order to service all of the schools. (Pl.'s LR 56.1(b)(3)(C) ¶ 52.) This is an undisputed fact upon which Dolan based her conclusion that the old marketing model was not working. That Lazarikos also felt that her marketing efforts were effective as to schools with which she worked (*id.*) does not create a reasonable inference that Dolan believed that the old marketing model provided effective marketing for the entire universe of schools in the Archdiocese. The same holds true for the positive feedback Archdiocese employees received from particular school principals and other supervisors in the Archdiocese.

Second, Zuno argues that the new systemic marketing model that Dolan created has not succeeded in increasing retention rates at Archdiocese schools and thus Dolan's justification for her termination made no sense. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 13-14.) Further, Zuno argues that because Dolan relied on inaccurate statistics to show an increase in retention rates in 2006-07, her justification for Zuno's termination must be a lie. (*Id.* 10-11.) However, "the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions." *McCoy*, 957 F.2d at 373; *see Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir. 1999) ("[I]t is not sufficient for the employee to show that his employer fired him for incorrect or poorly considered reasons. He must establish that the employer did not honestly believe the reasons it gave for terminating him."). Thus, whether Dolan's new systemic approach ultimately impacted student retention rates and whether Dolan cited inaccurate 2006-07 retention rates has no bearing on whether her reason for terminating Zuno was a pretext for

retaliation.[8]

Third, Zuno also argues that Dolan has shifted her justifications for the elimination of the marketing consultant positions, and thus her justifications are not the real reason for Zuno's termination. In particular, Zuno argues that although Dolan relied on the 2006-07 retention statistics in her January 30, 2007 affidavit, the Archdiocese does not rely on such statistics in support of its summary judgment motion. Contrary to Zuno's assertion otherwise, Dolan's rationale for Zuno's termination has remained the same: Dolan believed the old marketing model was ineffective and was not the best use of the Archdiocese's resources. Because Dolan's reliance on purportedly inaccurate retention statistics as support for the correctness of her business decision does not create a reasonable inference that Dolan's reason for terminating Zuno was phony, neither does the Archdiocese's omission of those statistics from its summary judgment motion.

Fourth, Zuno avers that Dolan lied in an affidavit (filed during the EEOC proceeding) regarding whether she knew that Zuno had complained to Lago about national origin discrimination or harassment, and thus her reason for terminating her must be a lie as well. The Court assumes as true for purposes of the summary judgment motion that Dolan knew that Zuno had complained of national origin discrimination, an issue that goes to the *prima facie* case element of protected expression. However, a dispute as to whether Dolan knew or had

---

[8]Zuno also avers that a reasonable jury could conclude from the Archdiocese's delay in producing various documents, including the retention statistics, that Dolan's justification for Zuno's termination is a lie. (Pl.'s Mem. 14-15.) Because the Court holds that the retention statistics do not create a triable issue of fact, the Court rejects this argument. Further, based on the particular facts of this case, no reasonable jury could conclude from the delay in any document production that Zuno's complaint to Lago caused Dolan to terminate her or that Dolan provided a phony reason for Zuno's termination.

acknowledged that Zuno had complained of national origin discrimination does not raise a triable issue as to whether the Archdiocese's reason for terminating Zuno is a pretext for retaliation. Moreover, Dolan's statement within the context of the affidavit is stated in such a way that the two statements are not inconsistent. (*Compare* Pl.'s LR 56.1(b)(3)(C) ¶ 66; Def.'s Ex. I, Dolan Dep., Ex. 1 ¶ 5, *with* Def.'s Ex. I, Dolan Dep., Ex. 2, Email from Dolan to Murphy of 9/23/05.) In her affidavit, Dolan stated: "At no time did Ms. Zuno complain to me about being harassed or discriminated against by Susan Burritt. I am not aware that she ever complained to any other supervisory or managerial personnel in the Archdiocese. When Ms. Zuno's position was eliminated in January 2004, I was not aware that Ms. Zuno felt she had been discriminated against and so at no time was this issue ever discussed." (Pl.'s LR 56.1(b)(3)(C) ¶ 66; Def.'s Ex. I, Dolan Dep., Ex. 1 ¶ 5.) In Dolan's 9/23/05 email to Maureen Murphy, she states that Lago told her that Zuno had complained about Burritt's being rude to Zuno and Mleczek. (Def.'s Ex. I, Dolan Dep., Ex. 2, Email from Dolan to Murphy of 9/23/05.) However, that Dolan knew of Zuno's complaints of Burritt's purported rudeness to Zuno and Mleczek does not mean that she lied when she stated in the context of her affidavit that she was unaware that Zuno had made any complaint of discrimination or harassment to her or any other supervisor. This does not create an inconsistency sufficient to raise a factual dispute as to pretext. For no reasonable jury could find that Dolan's awareness of Burritt's rudeness to Zuno and Mleczek and Dolan's statement that she was unaware that Zuno had complained of national origin discrimination and harassment meant that Dolan created a fake reason for the termination.

Fifth, Zuno argues that the Archdiocese's failure to investigate her claim of national origin discrimination and harassment by Burritt shows that its justification for Zuno's

18

termination must be a lie. In order for Zuno to create a triable issue, she must create a link between the Archdiocese's indifference to her complaints and the rationale it gave for her termination. *Cf. Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998). The undisputed facts in the record before the Court show that the Archdiocese investigated Zuno's complaint. Dolan spoke with Burritt and informed Mleczek that if she had a problem with another Archdiocese employee, she should talk to her supervisor, Jim Dwyer. Dolan reported back to Lago that Mleczek had not complained. The mere fact that Dolan did not conduct her investigation in a way that Zuno saw fit does not create a triable issue regarding whether Dolan's reason for eliminating the marketing consultant position is a pretext for retaliation. The quality of the investigation is, therefore, insufficient to permit a reasonable jury to find that Zuno's termination was retaliatory.

Sixth, Zuno argues that Dolan fabricated a false disciplinary record regarding Zuno's attendance. The disciplinary record of which Zuno speaks is single email from Burritt to Dolan dated December 20, 2004 that discussed whether Zuno should have been paid for a full or half day on December 10, 2004. This argument is a non-starter. First, Dolan has not stated that she terminated Zuno based on this incident. Second, Zuno has not argued that she was disciplined for, or even approached regarding, the December 10, 2004 incident or that her paycheck was docked for that date. This is not a case in which the decision maker launched a series of harassing disciplinary actions against an employee who engaged in protected activity such that it raises a reasonable inference as to whether the proffered reason for the employee's termination is a pretext for retaliation.

In sum, although Zuno has attempted in numerous ways to create a genuine issue as to

19

whether her termination was caused by her national origin discrimination complaint and whether the Archdiocese's reason for her termination is a pretext for retaliation, the record before the Court, viewed in the light most favorable to Zuno, contains nothing but a mere scintilla of evidence in support of her claim. Unfortunately for Zuno, "neither presenting a scintilla of evidence, nor the mere existence of some alleged factual dispute between the parties or some metaphysical doubt as to the material facts, is sufficient to oppose a motion for summary judgment." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal citations omitted). Accordingly, the Court grants the Archdiocese's motion for summary judgment as to Zuno's retaliation claim.

## Conclusion

For the foregoing reasons, the Court grants the Archdiocese's motion for summary judgment [doc. no. 65-1]. The Court denies Zuno's motion to strike portions of the Archdiocese's Response to Plaintiff's Statement of Facts and Reply Memorandum of Law as moot [doc. no. 82] because the Court did not rely on said portions in ruling on the motion for summary judgment. This case is hereby terminated.

**SO ORDERED.**          **ENTERED:**   *8/06/08*

HON. RONALD A. GUZMAN
**United States District Judge**

20